## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 04-80117-CIV-HURLEY/HOPKINS

STAN FREUND, on behalf of himself
and all others similarly situated,

     Plaintiff,

v.

HI-TECH SATELLITE, INC. and
JOEL EISENBERG,

     Defendants.

_____/

## PLAINTIFF'S POST TRIAL MEMORANDUM OF LAW

### Introduction

After the trial of this case on May 23, 2005, the court invited the parties to submit any additional information they deem necessary to aide the court in making its decision. This memorandum is being submitted by Plaintiff to specifically address two issues - travel time, and liquidated damages, and discuss Santelices handed to the court by the defense at the end of trial.

### The Law and Argument

Concerning compensability of the time Plaintiff Freund spent traveling from his home to the job site in the morning, at trial, counsel for Plaintiff submitted to the court that this time should be compensable. However, after further researching the issue, the

NON-COMPLIANCE OF S.D. fla. L.R. S.(A)
S.1A5

Page 1 of 4

time spent traveling to the first job site in the morning, is not compensable under the factual scenario in the present case. See 29 CFR § 785.35. Plaintiff had already agreed that the time spent traveling home at the end of the work day was not compensable.

The time Plaintiff Freund spent traveling from job site to job site throughout the work day is compensable and includable in the amount of overtime compensation due. Wirtz v. Sherman Enterprises, Inc., 229 F. Supp. 746, 753 (U.S.D.C. Md. 1964). The time Freund spent traveling between job sites is an integral part of and indispensable to his activity of installing the satellite and surround sound systems. Moreover, Freund, as the plaintiffs in Wirtz, had no principal place of activity but rather worked solely from job site to job site. Therefore, this time is includable in the overtime sought by Plaintiff Freund.

§216(b) of FLSA provides that an employer who violates the provisions of the Act is liable not only for the overtime compensation but "an additional equal amount as liquidated damages." An employer can avoid liquidated damages only by establishing the defense of good faith. The employer bears the burden of establishing this defense which requires "plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it." Even if the employer presents such proof the court has the discretion to deny or reduce the liquidated damages for all or any part of the relevant time period. "The burden is a difficult one to meet, however, and double damages are the norm, single damages the exception." Brock v. Wilamowsky, 833 F.2d 11, 19-20 (2d Cir. 1987)

Here, the employer presented no evidence of an honest intention to ascertain what the FLSA requires or to comply with it. The only testimony from Mr. Eisenberg was that he knew the law required him to pay employees overtime if they worked more than forty hours per week. There is no testimony by the defense as to what, if anything, it did to determine whether Plaintiff Freund was truly exempt from the provisions of the FLSA. Therefore, when rendering judgment this court should also award liquidated damages.

At the end of the trial defense counsel submitted to the court Santelices v. Cable Wiring, 147 F.Supp. 2d 1313 (S.D. FL. 2001). First, it is significant that the court in that case denied then employer's motion which sought summary judgment on the ground that the plaintiff was an independent contractor and not an employee. Second, the facts in the case at bar are even more favorable to Plaintiff Freund and establish an employer/employee relationship.

Plaintiff Santelices, unlike Plaintiff Freund, actually filed a separate tax return for his own installation business, maintained his own liability insurance, applied for an exemption from the state's workers' compensation laws, and obtained his own FEI number. Moreover, plaintiff Santelices possessed greater special skill to properly install digital cable. Santelices testified that he learned construction work with cable, underground fiber, splicing taps, and making new systems. Santelices was also required to pass a written exam and physically demonstrate his proficiency at digital cable installations.

Here, Freund did not perform such technical work as installing underground fiber, splicing taps and making new systems. He did basic satellite installations and according to the evidence the most technical "skills" were when he had to perform custom installation and fish a cable through the wall. Anyone watching This Old House on TV can learn how to do a wall fish.

The other factors which this court must weigh in deciding whether there was an employment relationship with Stan Freund and Hi-Tech Satellite are similar to the evidence in Santelices that supported an employment relationship. Therefore, considering that the court in Santelices denied the employers motion for summary judgment, and considering that there were additional factors in Santelices that supported an independent contractor relationship (i.e. filing a separate tax return for his installation business etc.) when this court weighs the factors in this case it should determine that an employment relationship existed between Plaintiff Freund and Defendants.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by hand to: ALAN P. DAGEN, ESQUIRE, 746 Heritage Drive, Weston, FL 33326-4539, this 25th day of May 2005.

RESPECTFULLY SUBMITTED,
VASSALLO & BILOTTA, P.A.

BY: _____
JOSEPH BILOTTA, ESQUIRE
1630 S. Congress Avenue, Suite 201
Palm Springs, FL 33461
Telephone: (561) 432-1994
Facsimile: (561) 432-1117
Florida Bar #: 0881414

Page 4 of 4

## Westlaw.

833 F.2d 11                                                                              Page 1

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

▷

United States Court of Appeals,
Second Circuit.
William E. BROCK, Secretary of Labor, U.S.
Department of Labor, Plaintiff-
Appellee, Cross-Appellant,
v.
Judith WILAMOWSKY d/b/a Continental Word
Processing, Inc., Defendant-Appellant,
Cross-Appellee.
**Nos. 1090, 1179, Dockets 87-6026, 87-6028.**

Argued June 8, 1987.
Decided Oct. 30, 1987.

Secretary of Labor brought Fair Labor Standards
Act action against employer. The United States
District Court for the Southern District of New
York, Kevin Thomas Duffy, J., 639 F.Supp. 1166,
entered judgment directing payment of liquidated
damages for willful violations, and both parties
appealed. The Court of Appeals, Kearse, Circuit
Judge, held that: (1) Secretary's calculation of
overtime pay was proper; (2) finding of willful
violation and absence of good-faith defense was
supported by evidence that employer had taken no
steps to determine legality of its method of
calculating the wages due its employees; (3)
determination not to award restitutionary injunctive
relief was supported by record; but (4) court was
not authorized to decline to award liquidated
damages for a portion of the time involved.

Affirmed in part, reversed in part and remanded.

West Headnotes

**[1] Labor and Employment ☞2305**
231Hk2305 Most Cited Cases
(Formerly 232Ak1271 Labor Relations)
Congress did not intend the "clock overtime"
provision of the Fair Labor Standards Act to apply
in circumstances where, for some of the nonregular

work periods, the employer paid less than one and
one-half times the basic rate. Fair Labor Standards
Act of 1938, § 7(e)(7), as amended, 29 U.S.C.A. §
207(e)(7).

**[2] Labor and Employment ☞2306**
231Hk2306 Most Cited Cases
(Formerly 232Ak1271 Labor Relations)
Where employer had basic hourly rate, hourly rate
of one and one-quarter times the basic rate for the
evening shift, and hourly rate of one and one-half
times the basic rate for the night shift, proper
method of calculating overtime pay for employees
who worked in all three shifts was to take the total
amount paid the employee under the rate schedule,
divided by the number of hours worked, with the
employee entitled to that rate for the first 40 hours
and one and one-half times that rate for all
additional hours. Fair Labor Standards Act of
1938, § 7(e)(7), as amended, 29 U.S.C.A. §
207(e)(7).

**[3] Labor and Employment ☞2394**
231Hk2394 Most Cited Cases
(Formerly 232Ak1535 Labor Relations)
Finding that failure to pay proper overtime wages
was a willful violation, so that three-year statute of
limitations under the FLSA applied, was supported
by evidence that employer had not obtained a ruling
from the Secretary of Labor as to the proper method
of calculating overtime and had not sought an
opinion from its attorneys and had taken no other
steps to determine lawfulness of its
conduct. Portal-to-Portal Act of 1947, § 6(a), 29
U.S.C.A. § 255(a).

**[4] Labor and Employment ☞2385(1)**
231Hk2385(1) Most Cited Cases
(Formerly    232Ak1511.1,    232Ak1511    Labor
Relations)

**[4] Labor and Employment ☞2387(11)**
231Hk2387(11) Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11                                                                                    Page 2

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

(Formerly 232Ak1535 Labor Relations)
Employer bears burden of establishing defense of good faith in action for overtime pay and the defense requires plain and substantial evidence of at least an honest intention to ascertain what the Fair Labor Standards Act requires and to comply with it. Portal-to-Portal Act of 1947, § 11, 29 U.S.C.A. § 260.

**[5] Labor and Employment ☞2394**
231Hk2394 Most Cited Cases
(Formerly 232Ak1535 Labor Relations)
Finding that employer did not act in good faith in failing to pay proper amounts of overtime, so that it was liable for liquidated damages, was supported by evidence that it failed to take any steps to determine the legality of its practices. Fair Labor Standards Act of 1938, § 16(b), as amended, 29 U.S.C.A. § 216(b); Portal-to-Portal Act of 1947, § 11, 29 U.S.C.A. § 260.

**[6] Labor and Employment ☞2390(4)**
231Hk2390(4) Most Cited Cases
(Formerly 232Ak1545 Labor Relations)
Fair Labor Standards Act does not authorize court to decline to award liquidated damages in whole or in part unless employer has established its good faith, reasonable basis defense. Fair Labor Standards Act of 1938, § 16(b), as amended, 29 U.S.C.A. § 216(b); Portal-to-Portal Act of 1947, § 11, 29 U.S.C.A. § 260.

**[7] Labor and Employment ☞2439**
231Hk2439 Most Cited Cases
(Formerly 232Ak1594 Labor Relations)
Decision of whether to grant injunctive relief for back pay under the Fair Labor Standards Act lies within the sound discretion of the district court. Fair Labor Standards Act of 1938, § 17, as amended, 29 U.S.C.A. § 217.

**[8] Labor and Employment ☞2439**
231Hk2439 Most Cited Cases
(Formerly 232Ak1601 Labor Relations)
Determination of district court not to award restitutionary injunction for back pay, and to instead enter only a judgment ordering the payment of back wages was supported by absence of evidence that

violation by the employer would continue. Fair Labor Standards Act of 1938, § 17, as amended, 29 U.S.C.A. § 217.
*12 William J. Stone, Washington, D.C. (George R. Salem, Monica Gallagher, Linda Jan S. Pack, Patricia M. Rodenhausen, U.S. Dept. of Labor, Washington, D.C., on the brief), for plaintiff-appellee-cross-appellant.

*13 Nathan Lewin, Washington, D.C. (Stephen L. Nightingale, Randall J. Turk, Miller, Cassidy, Larroca & Lewin, Washington, D.C., on the brief), for defendant-appellant-cross-appellee.

Before KEARSE, ALTIMARI, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Judith Wilamowsky, doing business as Continental Word Processing, Inc. ("Continental" or the "Company"), appeals from so much of a final judgment of the United States District Court for the Southern District of New York, 639 F.Supp. 1166, Kevin Thomas Duffy, *Judge,* as found that Continental had willfully violated the overtime compensation provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (1982) ("FLSA" or the "Act"), and required the Company to pay plaintiff Secretary of Labor (the "Secretary"), on behalf of certain of its employees, $76,436.33 as compensation for unpaid overtime for the period June 1, 1982, to December 31, 1985, plus an equal amount as statutory "liquidated damages" for the same period, and $7,222.25 in overtime compensation for the period January 1, 1986, to June 30, 1986. On appeal, Continental contends that the district court erred (1) in concluding that the Company's compensation schedule did not comply with the Act, (2) in awarding liquidated damages, and (3) in ruling that the proper limitations period was three years rather than two. The Secretary cross-appeals, contending principally that the district court should also have awarded liquidated damages for the period January 1, 1986, to June 30, 1986, and should have granted injunctive relief. For the reasons below, we reverse so much of the judgment as denied liquidated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11                                                                                              Page 3

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

damages for the period after December 31, 1985, and in all other respects we affirm.

### I. BACKGROUND

The basic facts are not in dispute. Continental is an employment agency that provides temporary word processor operators to law firms and other businesses in the New York metropolitan area on an around-the-clock basis, seven days a week. The Company's main office, which is open 9 a.m. to 5 p.m., Monday through Friday, takes calls from firms requesting such operators on a temporary basis, short term or long term, and places operators with these clients on the basis of their work skills and availability.

Although the parties have stipulated that, for the purposes of this litigation and on the present record, the word processor operators are "employees" of Continental within the meaning of the Act, the employment relationship is not of the traditional sort. Word processor operators may accept assignments from more than one agency and thus may be "employees" of more than one employment agency at a time; they are not required to accept any given assignment and may decline jobs for any reason, without penalty; they may agree, at a client's request, to stay on a job beyond the hours originally requested from Continental; and they may accept assignments directly from clients. Operators are also free to work during any work period and to work different hours from day to day or from job to job.

In a given week, Continental employs approximately 200 temporary word processors. These operators may work in one or more of three work periods--a day shift, from 8 a.m. to 5 p.m.; an evening shift, from 5 p.m. to 12 midnight; and a night shift, from midnight to 8 a.m. Continental pays its operators at different hourly rates for each shift. From June 1, 1982, to February 1, 1985, the basic pay scale for the most experienced operators was $12 per hour during the day shift, $15 per hour during the evening shift, and $18 per hour during the night shift. On February 1, 1985, these rates were increased to $13 per hour during the day shift, $16.50 per hour during the evening shift, and

$19.50 during the night shift. Operators whose work for a client extended from one shift into another were paid for hours worked in the latter shift either at the rate scheduled for the latter shift or at the rate payable for the initial shift, whichever was higher.

**\*14** Section 7 of the FLSA requires in general that an employee who works more than 40 hours in a given week be paid for the excess at a rate "not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). At the times pertinent to this action, Continental treated the rate scheduled for the day shift as the operator's "regular rate" of pay and treated the amounts by which the rates for evening and night work exceeded the day rate as premiums creditable toward any statutorily required payments for overtime. Continental claims that any operator who logged more than 40 hours of client work in a given week was paid either (a) the total wages payable according to the scale rates for time actually worked, or (b) the day shift rate for 40 hours plus one-and-one-half times that rate for any hours worked in excess of 40, whichever was higher.

The Secretary commenced the present action in February 1985, alleging that Continental had failed to pay its operators one-and-one-half times their regular rate of pay for time worked in excess of 40 hours per week, in violation of 29 U.S.C. §§ 207(a)(1) and 215(a)(2). The Secretary's principal premise was that the operator's regular rate of pay was the weighted average hourly rate of all compensation received by him or her, *i.e.,* a rate that is properly calculated by adding all of the wages payable for the hours worked at the applicable shift rates and dividing by the total number of hours worked. The Secretary sought, *inter alia,* an award of back wages for underpaid employees, an equal amount of liquidated damages pursuant to 29 U.S.C. § 216, and an injunction against further violations.

The parties entered into a stipulation in which they agreed, *inter alia,* that Continental's operators were entitled to be paid one-and-one-half times their regular rate of pay for hours worked in excess of 40,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11 Page 4

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

but disagreed as to how the regular rate of pay was to be computed. To illustrate the disagreement, the stipulation set forth examples, the clearer of which may be summarized as follows. In a given week, employee X worked during three shifts for which Continental paid him at the following rates:

```
Hours Worked        Rate   Amounts Paid
------------        ----   ------------

27.00 day           $12        $324.00
10.25 evening        15         153.75
12.50 night          18         225.00

   Totals 50.00 (sic)          $702.75
```

Continental contended that the Act entitled X to $12 per hour for 40 hours ($480) plus $18 (time and a half) per hour for the remaining 10 [sic ] hours ($180), or a total of $660. Under the Company's interpretation, therefore, X's actual compensation of $702.75 exceeded the statutory minimum. The Secretary, on the other hand, contended that X's regular rate of pay was $702.75 (the total paid according to the Company's scale) divided by 50 [sic ] (the total hours worked), or $14.06 per hour. He contended that X should have been paid $14.06 per hour for 40 hours ($562.40) plus $21.09 (time and a half) per hour for the remaining 10 [sic ] hours ($210.90), or a total of $773.30. Under this interpretation, X was paid $70.55 less than the statutory minimum.

Following motions by both sides for summary judgment, the district court, in an opinion reported at 639 F.Supp. 1166 (1986), concluded that the statutory regular rate was, as argued by the Secretary, the weighted average hourly rate of all compensation received by the employee. The court noted that the record included several affidavits of Continental's temporary word processors to the effect that they believed the "regular rate" to be the amount paid for work performed between 8 a.m. and 5 p.m., Monday through Friday, and affidavits from a like number of such employees stating that

they had never been advised by the Company that any particular period constituted either the normal workday or the normal workweek. Accordingly, given the acknowledged ability of these employees to work in any shift they wished and for however long they wished, the court found that the Company had "no 'applicable employment contract or collective[-]bargaining agreement' determining in 'good faith [...] the basic, normal, or regular workday' as required by [29 U.S.C. §] **15** 207(e)(7)," and that the higher rates paid to operators working the evening and night shifts were an integral part of the employees' regular rate. *Id.* at 1169. The court concluded that Continental had failed to pay the minimum overtime wages required by the FLSA.

The court found that Continental had known it was covered by the Act, yet had failed to conform its practices to the Act's requirements. Accordingly, applying the standard set by this Court in *Donovan v. Carls Drug Co.,* 703 F.2d 650 (2d Cir.1983), the court concluded that the Company's violation was "willful" and applied a three-year, rather than a two-year, statute of limitations pursuant to 29 U.S.C. § 255(a). It thus awarded the Secretary $76,436.33 for the period June 1, 1982, to December 31, 1985, and $7,222.25 for the period January 1, 1986, to June 30, 1986, amounts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11                                                                                          Page 5

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

stipulated by the parties, as back overtime compensation.

Further, the court found that though Continental had known it was subject to the Act, it had failed to seek an opinion, either from counsel or from the Secretary, and had taken no other steps to determine the lawfulness of its pay practices, until after an official investigation had been commenced. Finding, therefore, that Continental had lacked reasonable grounds for believing that its overtime pay practice did not violate the Act and that the Company had not acted in good faith within the meaning of 29 U.S.C. § 260, the court awarded the Secretary liquidated damages pursuant to 29 U.S.C. §§ 216, 260, in an amount equal to the compensatory damages for the pre-1986 period. The court did not award liquidated damages for the period January 1 to June 30, 1986.

The Secretary requested a rehearing, urging the court to enjoin Continental from any further violations of the Act. The court denied the request, stating that the Secretary had made no factual showing sufficient to indicate the need for an injunction.

These appeals followed.

## II. DISCUSSION

Continental appeals from the judgment against it, contending that the district court erred (1) in rejecting the Company's interpretation of "regular rate" and should have concluded that the Company's overtime payment practices did not violate the Act, (2) in finding that the Company's practices were not in good faith and sufficiently grounded in reason to avoid an award of liquidated damages, and (3) in ruling that the Company's violation was willful, thus triggering a limitations period of three years rather than two. The Secretary cross-appeals, contending principally that the district court should have (1) awarded liquidated damages for the period January 1, 1986, to June 30, 1986, (2) granted relief in the form of a restitutionary injunction rather than a monetary award of damages, and (3) enjoined any further violations of the Act.

We have considered all of the arguments advanced by the parties in support of their respective appeals and find merit only in the Secretary's contention that the court should have awarded liquidated damages for the period January 1, 1986, to June 30, 1986.

### A. The "Regular Rate" of Compensation

To the extent pertinent to the present controversy, FLSA § 7(a)(1) provides as follows:

(1) Except as otherwise provided in this section, no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Section 207(e) defines "regular rate," in pertinent part, as follows:

As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include--

....

**\*16** (7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a) of this section [) ], where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek.

29 U.S.C. § 207(e)(7) (footnote omitted). Section 207(e)(7) is also known as a "clock overtime" provision because it deals with premium compensation that is equal to the minimum statutory overtime rate, but is payable solely on the basis of the time of day in which the work is performed, independent of the number of hours worked. Under the terms of the Act, the premium portion of the clock overtime payment not only is not part of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11

Page 6

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

the "regular rate," *id.,* but also is creditable toward the required overtime compensation. 29 U.S.C. § 207(h).

Continental contends that it was entitled to judgment in its favor because the evening- and night-shift portions of its pay schedule are premium rates that provide "extra compensation" within the meaning of § 207(e)(7) and that it has thus complied with the Act. Alternatively it argues that since the night-shift portion of its pay schedule is one-and-one-half times its day-shift rate, and Congress intended that the Act be interpreted flexibly, we should (a) conclude that the night-shift rate complies fully with the Act and (b) require that the Company be given credit for the evening-shift premiums. We disagree.

Preliminarily, we note that, as the district court found, there was no collective bargaining agreement establishing Continental's day shift as the basic, normal, or regular workday. And, given the conflicting affidavits from employees, it is hardly clear that a trier of fact would find that there was a contract or agreement between Continental and its word processor employees establishing such a workday in good faith. Thus it is questionable whether Continental meets the contract-or-agreement requirement of § 207(e)(7) for good-faith establishment of a regular workday.

More importantly, as a matter of law the Continental pay schedule plainly did not meet the quantitative prerequisites set by § 207(e)(7) for minimum clock overtime compensation, for § 207(e)(7) deals with premium rates that are "not less than one and one-half times" the established regular rate. For example, after February 1, 1985, Continental's rate for the evening shift, $16.50, was roughly one-and-one-quarter times the $13 day-shift rate that Continental contends was the "regular rate." Thus, it is clear both that the evening premium rate alone was less than one-and-one-half times the alleged regular rate and that the evening and night premium rates, when averaged, were less than one-and-one-half times the alleged regular rate. Second, though the night rate viewed in isolation was one-and-one-half times the day rate, the fact

that the evening rate was less than one-and-one-half times the day rate means that the evening rate itself must be factored in to determine what the regular rate was, for the very definition of regular rate in § 207(e)(7) includes any off-hours premium as part of the regular rate if those premium rates are less than one-and-one-half times the basic rate. When Continental's evening rate is included in determining the regular rate, the regular rate was not $13 per hour but was more than $14.50 per hour, and even the night-shift rate of $19.50 per hour was less than one-and-one-half times the regular rate.

Continental argues that if its pay schedule contained only the day-shift rate and the night-shift rate, with no intermediate rate, that schedule would meet the quantitative requirements of § 207(e)(7), and it contends that Congress would have intended that the employer be given credit, rather than be penalized, for adding an intermediate premium to its schedule. We see no basis in the legislative history for inferring **\*17** that Congress had in mind a treatment at variance with that spelled out in the Act. The original clock overtime provision that was the forerunner to § 207(e)(7) was added to the FLSA in 1949 to solve the problem experienced in particular by the longshore and stevedoring industries, and to an extent by "other industries, such as electric and gas utilities, where continuous operations are essential," in complying with the Act. *See* S.Rep. 402 ("S.Rep. 402"), 81st Cong., 1st Sess., *reprinted in* 1949 U.S.Code Cong. & Admin.News ("USCCAN") 1617. In these industries, it had been "customary for employers and labor organizations representing the employees to provide by contract that compensation at the rate of one and one-half times the straight-time rate shall be paid for work outside the straight-time hours stipulated in the contract." *Id.* at 1619. In the longshore and stevedoring industries, "[o]ne of the purposes of this arrangement, substantially realized, was to concentrate the work of the longshoremen in the straight-time hours. The intended effect of such concentration was to bring about the employment of more men as there is pressure for more work to be done in the straight time hours." *Id.* at 1619- 20 (footnote omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11

Page 7

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

The original FLSA, which required that overtime be paid at the rate of one and one-half times the "regular rate" of pay, unfortunately contained no definition of "regular rate," and the Supreme Court's interpretation of the Act was that the premium rates paid for work outside the "straight-time" hours were includable in calculating the regular rate. *See Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948). Congress agreed with the employers that this interpretation resulted in the employers' paying overtime on overtime, and, to eliminate this effect, it enacted the so-called clock overtime provisions. S.Rep. 402, 1949 USCCAN at 1619-22.

[1] This history does not suggest that Congress intended its clock overtime provision to apply in circumstances where, for some of the nonregular periods, the employer paid less than one-and-one-half times the basic rate. Every mention of the problem referred to employers who were paying, for the entire non-straight-time period, at least the rate required in the Act's overtime provisions. Consistent with this history, the Secretary has issued an interpretative bulletin, which is due some deference, interpreting the clock pattern exception to be applicable only when all, not just some, non-straight-time hours are compensated at time-and-one-half. *See* 29 C.F.R. § 778.204 (1986).

[2] Thus, both the Act's legislative history and its administrative interpretation, no less than its explicit language, require that we uphold the district court's conclusion that Continental's pay schedule does not comply with the overtime compensation provisions of the Act, and that the Company is not entitled to credit for the premium portions of its evening and night rates. If there is any merit in Continental's belief that Congress would not have intended application of § 207(e)(7) in accordance with its terms to the business of agencies such as Continental, the Company's remedy is to seek an amendment of those terms by Congress.

B. *The Statute of Limitations*

The FLSA provides in general a two-year statute of

limitations on actions to enforce the Act, but provides a three-year limitations period for "a cause of action arising out of a willful violation." 29 U.S.C. § 255(a). In determining that Continental's violation was willful, the district court applied the standard established in *Donovan v. Carls Drug Co.,* 703 F.2d 650, in which this Court ruled that "[e]mployers 'willfully' violate FLSA when (1) they know that their business is subject to FLSA and (2) their practices do not conform to FLSA requirements." 703 F.2d at 652. *Accord Secretary of Labor v. Daylight Dairy Products, Inc.,* 779 F.2d 784, 789 (1st Cir.1985); *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). We rejected the notion that a violation could not be willful unless the employer knew it was violating a specific *18 provision of the Act, reasoning that such a rule would invite employers to remain ignorant of the precise terms of the Act.

In making their various arguments to this Court, neither party contends that any of the district court's findings of historical fact are clearly erroneous, *see* Fed.R.Civ.P. 52(a), or that those findings were not sufficient to support the conclusion that the Company's violation was willful within the meaning of *Carls Drug.* Each, however, urges us to abandon the *Carls Drug* standard, though they disagree on what the proper standard is. Continental argues that the proper standard is that adopted by the Third and Seventh Circuits, *i.e.,* that a violation is not willful unless the employer's conduct is knowingly or recklessly in violation of the statute, *see Brock v. Richland Shoe Co.,* 799 F.2d 80, 82-84 (3d Cir.1986), *cert. granted,* 484 U.S. 813, 108 S.Ct. 63, 98 L.Ed.2d 27 (1987); *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 308-11 (7th Cir.1986), and urges that under this standard we should limit the Secretary's recovery to a two-year period. The Secretary urges us to uphold the finding of willfulness but to do so under the standard adopted by the District of Columbia Circuit in *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), *i.e.,* that an employer's violation is willful when the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11                                                                                          Page 8

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

employer "is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt." *Id.* at 462.

We are aware that since our decision in *Carls Drug,* the Supreme Court has ruled that § 7(b) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(b) (1982), which allows an award of liquidated damages only upon a finding of "willful violations" of the ADEA, requires proof of a knowing violation of, or reckless disregard for, the requirements of the ADEA, *see Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). And we are informed that the Court has granted the petition for certiorari in *Brock v. Richland Shoe Co.,* in which the Secretary urges the Court to adopt the *Laffey* standard. Nonetheless, we see no reason in the present case to address the question of whether either the grant of certiorari in *Richland Shoe* or the ruling already rendered under the ADEA in *Thurston* has implications for the continuing vitality of *Carls Drug,* for given the district court's findings of fact, Continental's conduct would be considered willful under any of the three standards.

[3] First, focusing on the *Thurston* standard, we note that the district court in the present case, in rejecting Continental's effort to fend off an award of liquidated damages, found that Continental had not obtained a ruling from the Secretary, or even an opinion from its attorneys, as to whether its pay schedule met the requirements of the Act, and had taken no other steps to determine the lawfulness of its conduct. The court thus found that the Company did not have a good-faith or reasonable basis for believing that its conduct was lawful. In our view, the question of whether or not a defendant had a good-faith or reasonable basis for believing its acts were lawful differs little, if at all, from the question of whether or not its acts were performed with reckless disregard for their legality. In *Thurston,* the Supreme Court noted that the same concerns inform both questions, *see* 469 U.S. at 128 n. 22, 105 S.Ct. at 625 n. 22 (while ADEA § 7(b)'s willfulness provision does not incorporate 29 U.S.C. § 260, "the same concerns are reflected" in

both), and its inquiry paralleled that of the district court here. Thus, the *Thurston* Court concluded that the defendant before it had not acted willfully, *i.e.,* with a reckless disregard for the lawfulness of its acts, because the defendant had consulted with its attorneys, met with its employees, and devised a plan specifically for the purpose of complying with the ADEA. Given the contrary findings in this case that Continental adhered to its pay schedule without taking any steps whatever to determine the lawfulness of its conduct and hence had no good-faith or reasonable basis for believing its conduct was lawful, we have little doubt that **\*19** Continental's conduct would be found willful under the *Thurston* standard.

Nor would application of the *Laffey* standard rather than the *Carls Drug* standard affect the result reached here. Each of these standards comprises two tests, one focusing on the employer's state of mind, the other on its actions. The *Carls Drug* standard imposes on the plaintiff a heavier burden than does *Laffey* with respect to the employer's state of mind, but a lighter burden than *Laffey* with respect to the employer's conduct. Thus, the plaintiff must show the employer's actual knowledge of the applicability of the Act under *Carls Drug,* but need show only its awareness of an appreciable possibility of such applicability under *Laffey.* As to conduct, the plaintiff must show under *Laffey* that the employer failed to take steps reasonably calculated to resolve any doubt as to the Act's applicability, whereas under *Carls Drug* he need show only that the employer's conduct violated the Act.

The finding that Continental knew its operations were covered by the Act satisfies the more stringent *Carls Drug* test with regard to the employer's state of mind. The finding that the Company, knowing it was subject to the Act, failed to comply, failed to seek any opinion from counsel or from the Secretary as to its obligations under the Act, and failed to take any other steps to determine those obligations easily meets the more stringent *Laffey* test with respect to the employer's actions. Consequently, we conclude that the district court's findings were sufficient to support a conclusion of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11

Page 9

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

willfulness under either test.

In sum, we conclude that the district court properly ruled that the appropriate period of limitations was three years.

*C. Liquidated Damages*

Section 216(b) of 29 U.S.C. provides that an employer who violates the minimum-compensation provisions of the Act is liable for the amount of the unpaid minimum wages or overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Under 29 U.S.C. § 260, however,

if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [Act], the court may, in its sound discretion, award no liquidated damages or award any [lesser] amount thereof....

The district court awarded the Secretary compensatory damages for the period June 1, 1982, to June 30, 1986, and liquidated damages for the period June 1, 1982, to December 31, 1985, but not for the period January 1, 1986, to June 30, 1986. Continental contends that the court should not have awarded liquidated damages at all because it established its good faith and reasonable grounds for believing its pay schedule did not violate the Act. The Secretary contends that the court should have awarded such damages for the entire period for which compensatory damages were awarded. We agree with the Secretary.

[4] Under § 260, the employer bears the burden of establishing the defense of good faith. The defense requires plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it. *See Williams v. Tri-County Growers, Inc.,* 747 F.2d 121, 129 (3d Cir.1984); *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468-69 (5th Cir.1979). If the defendant presents such proof, the court has discretion to deny or reduce the liquidated damages for all or any part of the relevant time period. The burden is a

difficult one to meet, however, and "[d]ouble damages are the norm, single damages the exception...." *Walton v. United Consumers Club, Inc.,* 786 F.2d at 310.

[5] Continental does not dispute the findings, discussed above, that it failed to take any steps to determine the legality of its practices, but argues merely that it was entitled to disagree with the Secretary's interpretation of the Act and to adhere to industry practice in deeming its day-shift rate to be the employees' regular rate of *20 pay within the meaning of the Act. Rejection of this argument was appropriate, and we see no basis for overturning the findings that the Company had not acted in good faith and had no reasonable basis for believing that its practices complied with the Act. Consequently, we affirm the court's award of liquidated damages, so far as it went.

[6] We also, however, must reverse the judgment insofar as it failed to award liquidated damages for part of the period for which compensatory damages were awarded. The Act does not authorize the court to decline to award liquidated damages, in whole or in part, unless the employer has established its good-faith, reasonable-basis defense. The court awarded $7,222.25 in compensatory damages for the period January 1, 1986, to June 30, 1986, and did not state any reasons for its denial of liquidated damages for this period. Given its findings as to the lack of good faith and of any reasonable basis for Continental's belief in the lawfulness of its conduct, the court was required to award liquidated damages for the entire period.

*D. Other Contentions of the Secretary*

The Secretary's other contentions in support of his cross-appeal are that the district court was required to enjoin Continental from further violations of the Act, and that the court should have granted the Secretary a restitutionary injunction under 29 U.S.C. § 217 requiring Continental to pay back wages, instead of "merely" a judgment under 29 U.S.C. § 216 ordering it to pay those wages. The Secretary's argument in support of the latter contention is that "the purpose of a restitutionary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

833 F.2d 11                                                                                          Page 10

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

**(Cite as: 833 F.2d 11)**

injunction is ... to compensate employees who have not received their statutory wage and to correct 'a continuing offense against the public interest,' " and that an injunction would be enforceable against the employer itself through use of the court's contempt power, whereas the money judgment may be enforced only through execution on the employer's property. These contentions need not detain us long.

[7][8] The decision whether or not to grant injunctive relief under § 217 lies within the sound discretion of the district court. *Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 215, 79 S.Ct. 260, 265, 3 L.Ed.2d 243 (1959). We find no abuse of discretion in the form of the monetary award. The compensatory purpose of the Act generally will be as well served by a judgment for money damages as it will be by a restitutionary injunction in the same amount. The district court concluded that the Secretary had failed to present evidence of facts sufficient to demonstrate need for injunctive relief. In this Court, the Secretary has pointed to nothing in the record to suggest either that the violations by Continental would continue in the absence of injunction or that the Secretary will have any difficulty in collecting the damages awarded. Rather, the record shows substantial cooperation by Continental in the conduct of this lawsuit. It agreed to pay nearly $40,000 to settle a backpay claim on behalf of non-word-processing employees; it stipulated to the amount of overtime compensation due word processor operators under the Secretary's theory; and it spent $10,000 to update and computerize its recordkeeping procedures to facilitate compliance with the Act. These factors, while not foreclosing a grant of injunctive relief, indicate that the denial of such relief, where the Secretary has not persuaded the court of the need for an injunction, is not an abuse of discretion.

In light of this conclusion, we need not address Continental's contention that it would have been impermissible to grant relief under both § 216 and § 217 in the same action.

CONCLUSION

The judgment of the district court is reversed to the extent that it failed to award the Secretary $7,222.25 in liquidated damages for the period January 1, 1986, to June 30, 1986, and we remand for entry of a modified judgment including such an award. In all other respects, the judgment is affirmed.

**\*21** Costs to the Secretary on the appeal by Continental; no costs on the cross-appeal.

833 F.2d 11, 28 Wage & Hour Cas. (BNA) 608, 107 Lab.Cas. P 34,986

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

229 F.Supp. 746                                                                    Page 1

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

c
United States District Court D. Maryland.
W. Willard WIRTZ, Secretary of Labor, United
States Department of Labor,
Plaintiff,
v.
SHERMAN ENTERPRISES, INC., Defendant.
**Civ. A. Nos. 13822-14342.**

May 14, 1964.

Action to recover unpaid overtime compensation
under Fair Labor Standards Act. The District
Court, Winter, J., held that crew members who
traveled from state to state installing automatic
pinsetting equipment in bowling alleys were
engaged in commerce and were within the Act.

Judgment in accordance with opinion.

West Headnotes

**[1] Commerce ☞62.60**
83k62.60 Most Cited Cases
(Formerly 232Ak1161 Labor Relations)
Any determination of whether employee is engaged
in commerce or engaged in production of goods for
commerce within Fair Labor Standards Act depends
upon activities of employee, and not upon overall or
general business of employer. Fair Labor Standards
Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[2] Commerce ☞62.43**
83k62.43 Most Cited Cases
(Formerly 232Ak1138 Labor Relations)
Employees who are required to travel across state
lines and who are regularly engaged in traveling
across state lines as essential part of performance of
their duties are "engaged in commerce" within Fair
Labor Standards Act. Fair Labor Standards Act of
1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[3] Commerce ☞62.62**

83k62.62 Most Cited Cases
(Formerly 232Ak1163 Labor Relations)
Crew members who traveled from state to state to
install automatic pinsetting equipment in bowling
alleys were engaged in "commerce" and were
within Fair Labor Standards Act. Fair Labor
Standards Act of 1938, §§ 3(b), 6, 7, 29 U.S.C.A. §§
203(b), 206, 207.

**[4] Commerce ☞62.62**
83k62.62 Most Cited Cases
(Formerly 232Ak1163 Labor Relations)
Employees who loaded and unloaded interstate
shipments of tools and components of pinsetting
equipment installed in bowling alleys were engaged
in interstate commerce and were within coverage of
Fair Labor Standards Act. Fair Labor Standards
Act of 1938, §§ 3(b), 6, 7, 29 U.S.C.A. §§ 203(b),
206, 207.

**[5] Commerce ☞62.61**
83k62.61 Most Cited Cases
(Formerly 232Ak1162 Labor Relations)
De minimis activities in unloading replacement
parts of equipment moving in interstate commerce
were not sufficient to give employee coverage under
Fair Labor Standards Act, where his other activities
in respect to the equipment commenced after
interstate transportation ceased. Fair Labor
Standards Act of 1938, §§ 3(b), 6, 7, 29 U.S.C.A. §§
203(b), 206, 207.

**[6] Commerce ☞62.49**
83k62.49 Most Cited Cases
(Formerly 232Ak1148 Labor Relations)
The installation of automatic pinsetting equipment
in bowling alleys was within coverage of Fair Labor
Standards Act, where equipment came from without
the state and was sold as functioning unit
completely installed. Fair Labor Standards Act of
1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[7] Commerce ☞62.62**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

Page 2

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

83k62.62 Most Cited Cases
(Formerly 232Ak1163 Labor Relations)
Where employee's activities in respect to automatic pinsetting equipment in bowling alleys began after installation of equipment, at which point the interstate transportation of equipment ceased, such activities were not within coverage of Fair Labor Standards Act. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[8] Commerce ⬦62.65**
83k62.65 Most Cited Cases
(Formerly 232Ak1170 Labor Relations)
Employee was within coverage of Fair Labor Standards Act for period in which he was engaged in reconditioning and rebuilding repossessed machines which were thereafter sold to various customers throughout the eastern portion of the United States. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[9] Commerce ⬦62.61**
83k62.61 Most Cited Cases
(Formerly 232Ak1162 Labor Relations)
The mere use of mails in sending reports across state lines is not necessarily engaging in commerce within Fair Labor Standards Act; rather, it is only where interstate communication is a material part of an interstate business that such activity constitutes engaging in commerce and renders the person performing subject to coverage under the Act. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[10] Commerce ⬦62.40**
83k62.40 Most Cited Cases
(Formerly 232Ak1134 Labor Relations)
The test of coverage under Fair Labor Standards Act is whether the activity is so directly and vitally related to commerce as to be a part of it. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[11] Commerce ⬦62.64**
83k62.64 Most Cited Cases
(Formerly 232Ak1165 Labor Relations)
Preparation and mailing of service reports for an activity outside interstate commerce was not within

coverage of Fair Labor Standards Act. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207.

**[12] Labor and Employment ⬦2319**
231Hk2319 Most Cited Cases
(Formerly 232Ak1289 Labor Relations)
The time spent in traveling from one job site to another was includable in computing amount of overtime compensation under Fair Labor Standards Act, where defendant sold its machines installed in place and the machines were of such a nature that they could be installed in place only by traveling crews of installation employees. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207; Portal-to-Portal Pay Act of 1947, § 4, 29 U.S.C.A. § 254.

**[13] Labor and Employment ⬦2300**
231Hk2300 Most Cited Cases
(Formerly 232Ak1278.1, 232Ak1278, 232Ak278 Labor Relations)
Where there was an express provision in employment contract for payment of travel compensation, employer would be liable at the rates prescribed by the Fair Labor Standards Act if they were greater than the amount fixed by the agreement. Fair Labor Standards Act of 1938, §§ 6, 7, 29 U.S.C.A. §§ 206, 207; Portal-to-Portal Pay Act of 1947, § 4, 29 U.S.C.A. § 254.
**\*747** Marshall H. Harris, Deputy Regional Atty., U.S. Dept. of Labor, Charles Donohue, Sol., and Ernest N. Votaw, Regional Atty., U.S. Dept. of Labor, Chambersburg, for plaintiff.

Lawrence T. Zimmerman, Washington, D.C., Earle K. Shawe, Baltimore, Md., for defendant.

WINTER, District Judge:

Plaintiff sues, pursuant to the provisions of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201 et seq. to recover unpaid overtime compensation allegedly due under 29 U.S.C.A. § 207. As presented for decision, the controversy involves the question of coverage under the Act of four employees of the defendant during the period of the work weeks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

Page 3

ending May *748 28, 1960 to August 25, 1961. [FN1] The parties have entered into stipulations concerning the hours worked, travel time, amounts paid by the defendant, and amounts claimed by the plaintiff, for each of Alphonse Polselli, Thomas Polselli, Robert J. Kittell, and Thomas L. Simon, so that the parties may agree as to the amount of the judgment to which plaintiff is entitled to the extent, if any, that coverage is found.

Defendant, a Massachusetts corporation having offices and a ship in Gambrills, Maryland, is engaged in the lease or sale of automatic pinsetting equipment for bowling alleys in various states of the Eastern United States. New equipment is manufactured for defendant by Crompton-Knowles Corporation, an unaffiliated corporation, situated in Worcester, Massachusetts. Repossessed equipment is reconditioned and rebuilt by defendant at its shop at Gambrills, Maryland. Defendant distributes two types of machines-- 'rubber duck,' which is distributed exclusively to bowling alleys in Pennsylvania, and 'hard duck,' which is distributed elsewhere throughout the Eastern United States.

During the period in suit, defendant's salesmen solicited business throughout the East from Vermont to Georgia. Machines were sold absolutely, or on an installment sales contract, or leased under a lease containing an option to purchase. An essential part of every sale or lease was an undertaking by defendant to install the equipment on the customer's premises and, as part of such installation, to maintain its personnel on the premises for a period after installation to adjust the equipment and put it in good working order, to train the customer's employees how to maintain and make minor adjustments to the equipment, and to replace defective parts for a period of six months after installation.

When defendant's salesmen procured a customer whose credit was approved, defendant notified Crompton-Knowles, and the latter made shipments of the component parts of the pinsetting equipment directly to the customer. Shipment was usually made be common carrier. Defendant then dispatched a traveling installation crew to the

customer's premises, together with the tools necessary to install, adjust and service the machines. During the relevant period the volume of defendant's business was so great that its installation crews were almost constantly either at a job site or traveling to one.

The installation crews normally consisted of ten men, one of whom was the crew chief. Each crew chief would communicate with the defendant's work manager at the Gambrills, Maryland office to ascertain the location of a job site. The work chief would then direct the crew to report to a certain customer's bowling alley at a designated time. Although not strictly required to do so, the members of a crew traveled to a job site in two station wagons owned by the defendant. While traveling, each member would receive an allowance of $1.00 for each forty miles traveled and, in addition, would receive a per diem of $7.50 for subsistence if the job site was more than a given distance from Gambrills, Maryland, the distance being approximately the distance required to travel outside the State of Maryland. A crew member could elect to travel in his own vehicle, but he would not be paid the $1.00 per forty miles' allowance unless he carried other employees as passengers. In addition to the two station wagons used by the installation crew for transportation, defendant supplied two panel trucks to carry power and hand tools necessary for the installation of the pinsetting equipment. Upon arrival at a job *749 site it was one of the duties of the crew to unload these panel trucks.

During the portion of the period in question that each was an employee of the defendant, Alphonse Polselli, Thomas Polselli and Robert Kittell were members of the same 'hard duck' crew, and Alphonse Polselli was the crew chief. Thomas Simon was a member of a 'hard duck' crew for approximately seven weeks; for two weeks he was engaged at the Gambrills, Maryland shop reconditioning and rebuilding repossessed machines; and the remainder of his period of employment he was engaged in the servicing of 'rubber duck' machines in Pennsylvania. Because his duties at Gambrills, Maryland, and in servicing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

Page 4

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

'rubber duck' equipment, present somewhat different factual aspects, they will be considered separately hereafter.

When a 'hard duck' installation crew arrived at a job site the crew chief would communicate with the common carrier and arrange for the delivery of the machine components to the customer's bowling alley. The number of trucks used by the common carrier depended on the size of the customer's premises, since each alley required the component parts for one complete machine. Although the size varied, the average installation was sixteen machines at a given site. The components of sixteen machines would require two trucks. The components for each machine were packed in fifteen to twenty cartons, and the weight of these cartons would range from ten to seven hundred fifty pounds. When the carrier's vehicles arrived at the customer's premises, the members of the crew would unload the vehicles by removing the cartons from the truck and placing them in appropriate positions on the alleys in the customer's establishment. Unloading took between two-and-a-half and four hours. Casual labor was sometimes employed to unload such vehicles, but the use of casual labor was the exception, rather than the rule. When the truck was unloaded and the components of the machines unpacked, the crew would proceed to assemble and install the equipment. While not determinative of any issue in this case, and although sharply disputed, I find that during the period in question initial installation consumed approximately eight to ten hours per machine. Installation was followed by testing and the making of required adjustments, and then the installation crew would immediately depart to the next job site, leaving one member behind for approximately two weeks to continue to make adjustments as needed during actual use of the equipment by the customer's patrons and to train the customer's maintenance personnel.

During the period in suit there were 643 installations of new equipment, and 140 installations of reconditioned and rebuilt machines. The reconditioned and rebuilt machines had been obtained by repossession. When defendant repossessed equipment, the installation crews would travel to the customer's alley and perform the manual function of disassembling and removing the machines. The components of the machines would be sent to the Gambrills, Maryland shop where they would be rebuilt and reconditioned and then stored in a warehouse in Maryland. When resold defendant would ship the components of these machines directly to the customer and the installation crew would perform the same functions as with totally new equipment.

Each member of the installation crew was required to keep certain records, in addition to his other duties. He kept personal time and travel records and was paid $1.00 per week for this function, which consumed approximately one hour. Each week the crew chief would collect these records from the crew, check their accuracy against records which he kept relating to each member of the crew, and send the crew's records to the Gambrills, Maryland office, which, in turn, issued appropriate checks in payment of the amounts shown to be due.

During the time that Thomas Simon performed duties in reference to 'rubber duck' machines, he was required to deal with pinsetting machines of greater complexity. These, consisting of more parts *750 than the 'hard duck' machines, were subject to more frequent breakdowns. Mr. Simon's principal functions were to replace defective parts after the installation and during actual operation by the customers, and to train the customer's mechanics. Indicative of the greater servicing required by 'rubber duck' equipment, Mr. Simon on one occasion was required to remain at the premises of one customer for approximately one thousand hours. Mr. Simon, too, kept personal time and travel records, and he was required to prepare service forms supplied by the Gambrills, Maryland office for each machine which he serviced. His personal records and service forms were collected by his supervisor and, presumably, forwarded to the Gambrills, Maryland office.

Plaintiff advances four theories of coverage. They are that: (1) the employees regularly engaged in traveling across state lines in the performance of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

Page 5

their duties as members of an installation crew are covered by the Act, (2) the preparation of time, subsistence and service reports is covered by the Act, (3) loading and unloading of components of pinsetting machines and tools to install or disassemble pinsetting machines, when the same have been shipped in interstate commerce, are so closely related to interstate commerce as to be covered by the Act, and (4) employees while engaged in the installation and servicing of equipment received from an interstate shipment in the performance of a contract which required the assembling and installation of pinsetting machines which have been shipped in interstate commerce, are covered by the Act. Essentially, all of these contentions stem from the assertion that, in the various respects stated, the employees are 'engaged in commerce' or, alternatively, 'engaged * * * in the production of goods for commerce,' as those terms are used in §§ 6 and 7 of the Act, 29 U.S.C.A. §§ 206 and 207. [FN2]

[1] At the outset it should be noted that any determination of whether an employee is engaged in commerce or engaged in the production of goods for commerce depends upon the activities of that employee, and not upon the over-all or general business of his employer, Mitchell v. Lublin, McGaughy & Asso., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451 (4 Cir. 1963), cert. den.84 S.Ct. 1222, 12 L.Ed.2d 216 (1964); Crook v. Bryant, 265 F.2d 541 (4 Cir. 1959) ; Goldberg v. Harrell, 206 F.Supp. 71 (D.C.Md.1962). From a study of the evidence and examination of the authorities cited by both parties, the Court concludes, as hereafter more specifically indicated, that plaintiff should prevail, in that the activities of three of the employees are covered in their entirety by the provisions of the Act, and the activities of Mr. Simon are covered in part. This conclusion is reached on the basis of three of the grounds which the plaintiff advances. The three grounds on which coverage is found are as follows:

[2][3] (1) 'Commerce' is defined by § 3 of the Act, 29 U.S.C.A. § 203(b), as 'trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.' Employees who are required to travel across *751 state lines and who are regularly engaged in traveling across state lines as an essential part of the performance of their duties are engaged in commerce; Mitchell v. Kroger Company, 248 F.2d 935 (8 Cir. 1957). See also, Mitchell v. Lublin, McGaughy & Asso., supra; Goldberg v. Sorvas, 294 F.2d 841 (3 Cir. 1961); 29 C.F.R., § 776.12 (1963). It is concluded, therefore, that coverage exists with respect to Messrs. Alphonse and Thomas Polselli and Kittell with regard to all of their activities, and that there is coverage with respect to Mr. Simon during the period that he was a member of an installation crew. As to these activities, the conclusion is inescapable that traveling from state to state was required and was an essential part of the duties of each member of an installation crew. On this theory there is not additional coverage with respect to Mr. Simon because his traveling, while he worked on 'rubber duck' machines, was confined to the State of Pennsylvania.

[4][5] (2) The members of an installation crew were required to load and unload interstate shipments of tools and components of pinsetting equipment. The components were still in the channels of interstate commerce at the time of the unloading, and had entered the channels of interstate commerce at the time of loading by Crompton-Knowles. The component parts of repossessed machines which were being returned to Gambrills, Maryland for reconditioning entered the channels of interstate commerce when the machines were disassembled and the components loaded for shipment. When reconditioned machines were resold, the components were in the same posture as components of new machines shipped by Crompton-Knowles. Tools, when sent from state to state, are in the channels of interstate commerce the same as components of new machines. Activities of this nature are sufficient to render the person engaged therein in interstate commerce and within coverage of the Act, Walling v. Jacksonville Paper

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

Co., supra; McComb v. Herlihy, 161 F.2d 568 (4 Cir. 1947); Goldberg v. Harrell, supra. These activities of the several employees on whose behalf suit is brought, being unsegregated from their other activities, are sufficient to extend the coverage of the Act to Messrs. Alphonse and Thomas Polselli and Kittell, and also to Mr. Simon during the period that he was a member of an installation crew. Coverage on this theory does not extend to the other activities of Mr. Simon. Although it could be claimed that if he unloaded replacement parts, when in Pennsylvania working on 'rubber duck' machines, Mr. Simon was engaged in interstate commerce, the record discloses that his activities in this regard were de minimis and not sufficient to entitle him to coverage under the Act, Crook v. Bryant, supra.

[6] (3) Plaintiff's fourth theory of coverage is that the pinsetting equipment was still 'in commerce' while the crew members were installing the machines in the customer's bowling alleys. Because the machines were sold as installed, complete functioning units, the 'practical continuity of movement of the goods' continued until they were unloaded and installed in the customer's premises, Walling v. Jacksonville Paper Co., supra (317 U.S. p. 568, 63 S.Ct. p. 335). Because of the complexities of the machines and the defendant's obligations under the various instruments by which it sold or leased the machines, it cannot be said that the interstate movement ended when the components of the machines were removed from the trucks or placed upon the customer's premises prior to installation. In short, the 'contract or understanding pursuant to which goods are ordered * * * indicates where it was intended that the interstate movement should terminate,' Walling v. Jacksonville Paper Co., supra (317 U.S. p. 569, 63 S.Ct. p. 336), and in this case that intention was clearly when installation of the machines was completed. The crew members were 'engaged in commerce' during the installation of the machines since, manifestly, this work was 'so directly and vitally related to the functioning of an instrumentality or facility of interstate *752 commerce as to be, in practical effect, a part of it,' rather than isolated, local activity,' Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 429, 75 S.Ct.

860, 862 (1955); Mitchell v. Lublin, McGaughy & Asso., supra; Wirtz v. Modern Trashmoval, Inc., supra (323 F.2d p. 457). See also, Brown v. Minngas Co., 51 F.Supp. 363 (D.C.Minn.S.D.1943) . While Mr. Simon was a member of an installation crew he was thus covered by the Act, as were Messrs. Alphonse and Thomas Polselli and Kittell.

[7] Under this theory, Mr. Simon was not 'engaged in commerce' while in Pennsylvania working on 'rubber duck' machines. His activities did not begin until installation of the pinsetting equipment was completed and, as previously indicated, it was at that point that the interstate transportation of the machines and their components ceased, Wirtz v. Modern Trashmoval, Inc., supra.

[8] Mr. Simon was covered by the Act for the two week period that he was engaged in reconditioning and rebuilding repossessed machines at the Gambrills, Maryland shop. The record is clear that repossessed machines, after being serviced at Gambrills, Maryland, were sold to various customers throughout the eastern portion of the United States in the same manner as were new machines manufactured by Crompton-Knowles Corporation. Thus, for this period of time Mr. Simon was 'engaged in the production of goods for commerce' in the same manner as the two employees as to whom, after trial, defendant has conceded coverage.

[9][10] The remaining theory advanced by the plaintiff admits of some doubt. The cases seem clear that the mere use of the mails in sending reports across state lines is not necessarily engaging in commerce within the meaning of the Act. Rather, it is only where the interstate communication is a material part of an interstate business that such activity constitutes engaging in commerce and renders the person performing it subject to coverage under the Act, Mitchell v. Lublin, McGaughy & Associates, 250 F.2d 253 (4 Cir. 1957), reversed on other grounds, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). Cf. Donovan v. Shell Oil Co., 168 F.2d 229 (4 Cir. 1948). The test of coverage is whether the activity is so directly and vitally related to interstate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

Page 7

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

commerce as to be a part of it, Mitchell v. Lublin, McGaughy & Asso., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943); Wirtz v. Modern Trashmoval, Inc., supra.

[11] In regard to Messrs. Alphonse and Thomas Polselli and Kittell, coverage has been found, and how their recordkeeping activities should be classified with regard to coverage or noncoverage is academic. As to Mr. Simon, it has been concluded that he was not engaged in commerce when he was servicing 'rubber dock' machines and, hence, the preparation and mailing of service reports for that activity, as well as reports of the time which he spent on that activity, have no direct and vital relation to interstate commerce.

[12] The remaining question to be decided is whether, in computing the amount of overtime compensation to which the employees for whom plaintiff has sued are entitled, the time spent in traveling from one job site to another should be included. Defendant relies upon § 4 of the Portal-to-Portal Pay Act, 29 U.S.C.A. 254, the pertinent provisions of which are set forth below, to exclude travel time from the computation. [FN3]

**\*753** This section of the Portal-to-Portal Pay Act was the subject of consideration in Steiner v. Mitchell, 350 U.S. 247, p. 255, 76 S.Ct. 330, p. 335, 100 L.Ed. 267 (1956), where significantly, the Court said:

'On the whole it is clear, we think, that while Congress intended to outlaw claims prior to 1947 for wages based on all employee activities unless provided for by contract or custom of the industry, including, of course, activities performed before or after regular hours of work, it did not intend to deprive employees of the benefits of the Fair Labor Standards Act where they are an integral part of and indispensable to their principal activities.' (emphasis supplied)

If the test to be applied is whether the activity of travel is an integral part of and indispensable to the principal activity of installation, the answer can

only be in the affirmative. As has been repeatedly stressed, defendant sold its machines installed in place and the machines were of such a nature that they could be installed in place only by traveling crews of installation employees, and it is on behalf of such employees that this suit is brought. These employees were the only persons who possessed the requisite skills to install the machines, and it is not without significance that these employees had no principal place of activity but, rather, worked solely from job site to job site. It is concluded that § 4(a) of the Act, 29 U.S.C.A. § 254(a), does not insulate the defendant from liability, Steiner v. Mitchell, supral Mitchell v. King Packing Co., 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956); Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721 (5 Cir. 1961); 29 C.F.R., § 785.38, et seq.

[13] Even if it is assumed that travel by employees was not an integral part of and indispensable to their principal activities of installation and servicing incident thereto, the record discloses that even when riding in a station wagon furnished by defendant, defendant paid the employees compensation at the rate of $1.00 for each forty miles travel. Thus, there was an express provision of the employment contract in effect between the parties, and 4(b) of the Act, 29 U.S.C.A. 254(b), would render defendant liable at the rates prescribed by the Fair Labor Standards Act if they are greater than the amount fixed by agreement of the parties.

The parties may compute the amounts due from defendant to the plaintiff on behalf of the four employees for whom the suit has been pressed, in accordance with their stipulation and the views expressed herein, and present a form of order entering judgment for plaintiff.

> FN1. As originally filed, eight employees were concerned. At trial the Secretary dismissed his case as to two employees and, after trial, the defendant has conceded coverage as to two other employees.
> It should be noted that the period in question was prior to the effective date of the 1961 amendments to the Fair Labor Standards Act.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.Supp. 746

229 F.Supp. 746, 49 Lab.Cas. P 31,584

**(Cite as: 229 F.Supp. 746)**

FN2. § '206. Minimum wages; effective date
(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates-- * * *'
' § 207. Maximum hours
(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. * * *'

FN3. ' § 254. Relief from certain future claims under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, and the Bacon-Davis Act
(a) Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standard Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947--
(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
(2) activities which are preliminary to or postliminary to said principal activity or activities,
which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.
(b) Notwithstanding the provisions of

subsection (a) of this section which relieve an employer from liability and punishment with respect to an activity, the employer shall not be so relieved if such activity is compensable by either--
(1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or
(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.'

229 F.Supp. 746, 49 Lab.Cas. P 31,584

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

29 CFR § 785.35                                                                                           Page 1

29 C.F.R. § 785.35

**c**

**CODE OF FEDERAL REGULATIONS**
**TITLE 29—LABOR**
**SUBTITLE B—REGULATIONS RELATING**
**TO LABOR**
**CHAPTER V—WAGE AND HOUR DIVISION,**
**DEPARTMENT OF LABOR**
**SUBCHAPTER B—STATEMENTS OF**
**GENERAL POLICY OR INTERPRETATION**
**NOT DIRECTLY**
**RELATED TO REGULATIONS**
**PART 785—HOURS WORKED**
**SUBPART C—APPLICATION OF**
**PRINCIPLES**
**TRAVELTIME**
Current through May 17, 2005; 70 FR 28407

§ 785.35 Home to work; ordinary situation.

An employee who travels from home before his
regular workday and returns to his home at the end
of the workday is engaged in ordinary home to work
travel which is a normal incident of employment.
This is true whether he works at a fixed location or
at different job sites. Normal travel from home to
work is not worktime.

<General Materials (GM) - References,
Annotations, or Tables>

29 C. F. R. § 785.35

29 CFR § 785.35

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.